# Supreme Court of Florida

_____

No. SC11-475
_____

**LEONARD PATRICK GONZALEZ, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[April 10, 2014]

PER CURIAM.

Leonard Patrick Gonzalez, Jr., appeals his convictions of two counts of first-degree murder and one count of home invasion robbery with a firearm and his corresponding sentences of death and life imprisonment. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

Leonard Patrick Gonzalez, Jr. (Gonzalez) was charged with two counts of first-degree premeditated murder in the shooting deaths of Byrd and Melanie Billings in their Escambia County home on the evening of July 9, 2009. Gonzalez

was also charged with armed home invasion robbery for this incident. Gonzalez and four other men—Frederick Thornton, Rakeem Florence, Donnie Stallworth, and Wayne Coldiron—invaded the Billings' home at three different entry points with the intent to steal a safe that purportedly contained $13 million. The men wore black clothing, masks, and gloves and were carrying firearms. Florence carried an AK-47, Stallworth and Thornton had shotguns, Coldiron had a .357 revolver, and Gonzalez carried a nine-millimeter automatic pistol. Three others— Leonard Gonzalez, Sr., Gary Sumner, and Pamela Long-Wiggins—also had roles in the crimes. Gonzalez, Sr., remained in Gonzalez's large red van outside of the Billings' home. Sumner stayed out on the highway in a Ford Explorer, communicating with Gonzalez via walkie-talkie. Long-Wiggins participated after the fact by hiding the safe taken from the Billings' home and either hiding or disposing of the weapons used in the home invasion. The men did not know that the Billings had a surveillance system in their house in order to monitor their nine adopted children who have various disabilities. That surveillance system captured some of the events during the invasion, including the Billings being accosted in their living room, and provided a view of Gonzalez's red van parked outside of the home. However, there was no camera in the Billings' master bedroom where the fatal shots were fired.

Two of the participants in the crimes, Thornton and Florence, told their families that they knew about the murders because they had accompanied some men in a van to the house to buy "weed," but never entered the house and did not know that anything was going to happen until they heard the shots and saw the men run out of the house. At the urging of their families, Thornton and Florence turned themselves in to law enforcement. When the police confronted the men with evidence from the surveillance video, Thornton and Florence admitted that their initial stories were false and confessed to their involvement in the crimes. Both men testified that Gonzalez was the individual who planned the crimes. He solicited the others to participate in the home invasion robbery in order to get $13 million that he believed the Billings kept in the safe. The group met several times at Fifth Dimensions, a car body shop in Fort Walton Beach owned by Sumner. As the plans progressed, they also met at Gonzalez, Sr.'s trailer in Pensacola. Gonzalez would contact Sumner, who would then contact Thornton, Florence, and Stallworth, to gather for these meetings.

On the day of the murders, the group was contacted and drove in Stallworth's Explorer to a Wal-Mart in Gulf Breeze to meet Gonzalez. Gonzalez was driving a red minivan that belonged to Long-Wiggins. Sumner, Stallworth, and Gonzalez went into the Wal-Mart, and Thornton and Florence remained in the Explorer in the parking lot. A security video from the Wal-Mart places Sumner,

Stallworth, and Gonzalez inside the store on July 9 at 3:30 p.m., where they purchased a pair of boots. The men then drove in the two vehicles to Gonzalez, Sr.'s house, where Coldiron was also present.

Gonzalez provided the weapons, black clothing, masks, and gloves that the participants used in the crimes. Gonzalez showed the others pictures and a layout of the Billings' home and gave them their assignments. He told Thornton and Florence to enter through a door on the far left of the home, Stallworth to enter through the front door, and Coldiron to enter with Gonzalez through a sliding glass door in the master bedroom. Gonzalez showed the others how to use zip ties to secure the victims' hands and passed out the ties. He remained in charge after the participants entered the Billings' home.

Gonzalez accosted Mr. Billings and demanded that Mr. Billings tell him where the money was located. When Mr. Billings replied that he did not have any money, Gonzalez fired a shot into the floor. Gonzalez repeated the same question and received the same response from Mr. Billings. Gonzalez then shot Mr. Billings in the leg. Gonzalez repeated the question again, received the same response, and shot Mr. Billings in the other leg. Gonzalez then led the Billings into the master bedroom. Thornton and Florence's testimony about the events inside the house was consistent with the surveillance video. According to Thornton's account, the Billings, Gonzalez, and Stallworth were in the bedroom.

While Thornton retrieved duffel bags from the van outside, he heard three more shots. When Thornton returned to the bedroom, he saw Mr. Billings lying face down on the floor in a pool of blood. Gonzalez then asked Mrs. Billings to open the safe in the closet of the bedroom. Thornton saw Gonzalez fire the gun again, but could not see Mrs. Billings. According to Florence's account, only Gonzalez was in the bedroom with the Billings when the shots were fired. Gonzalez then ordered the others to take the safe and leave. When Florence entered the bedroom to retrieve the safe, he saw Mr. Billings lying on the floor, but could not see Mrs. Billings.

The group left in Gonzalez's large red van, then met up with Sumner in the Explorer. The safe and guns were transferred to the Explorer. Gonzalez told Gonzalez, Sr. and Coldiron to drive the large red van back to Gonzalez, Sr.'s house in Pensacola. The others got into the Explorer, removed their black clothing, and drove to a location where they had left Long-Wiggins' red minivan before the crimes were carried out. Gonzalez, Sumner, and Stallworth drove the red minivan back to the Pensacola area. Thornton and Florence returned in the Explorer and met with the others in the red minivan at the Wal-Mart in Gulf Breeze. Both vehicles were driven to Long-Wiggins' antique store. The safe was left with Long-Wiggins in a storage area behind her store. The guns were left with Long-Wiggins

and Gonzalez. Gonzalez told Thornton and Florence to take the clothing worn during the crimes and burn all of it, which they did.

Law enforcement was called to the Billings' home by April Spencer, a registered nurse who lived in a trailer on the Billings' property and helped them with the children. Spencer had been alerted when Adrianna, one of the Billings' children, came to her trailer. Adrianna had been instructed to go to Spencer's trailer in a phone conversation she had with Ashley Markham, the Billings' adult daughter who did not live in the home. Markham had received a missed call from her mother's home phone number and returned the call. Jake, another of the Billings' children, answered the call and was screaming incoherently. Markham asked him to speak to their mom or dad, but instead, Adrianna got on the phone and alerted Markham about what was happening in the house. Markham told Adrianna to run to April Spencer's house and get her. When Spencer arrived, she saw blood in the hallway and found the Billings on the floor of the master bedroom. She called emergency services, and the Escambia County Sheriff's Office responded to the scene.

The Billings both died of multiple gunshot wounds. Mr. Billings was shot five times: in both legs, the left cheek (exiting at the right side of the neck), and twice in the back of the head. The two leg wounds would have been survivable; the cheek wound have been survivable for a few minutes until the victim drowned

in his own blood; the two head wounds were inflicted close together, based on the similar angles and positions of the wounds, and were each fatal. Mrs. Billings was shot four times: once in the face, once in the head, and twice in the chest. All of her wounds were fatal; the first shot to her face would have rendered her unconscious; the other shots were inflicted as she lay on her back on the floor. Mr. Billings was located face down in the bedroom with a zip tie on his left wrist; Mrs. Billings was on her back in front of the closet. All of the bullets and shell casings recovered from the crime scene were nine millimeter. A firearms examiner was able to show that the two bullets recovered from Mrs. Billings' body were fired from a Springfield Armory nine-millimeter pistol that was found hidden in the springs under the cushion of the back seat of a vehicle owned by Long-Wiggins. Three other bullets and all ten bullet casings recovered at the residence were also fired from that nine-millimeter pistol.

The safe taken from the Billings' home was recovered unopened under a pile of bricks in the backyard of Long-Wiggins' residence. Long-Wiggins' fingerprints were found on a plastic bag covering the safe. Long-Wiggins and her husband, Hugh Wiggins, gave an AK-47 and two shotguns to Eddie Denson, a friend in Mississippi, who turned the weapons over to law enforcement. Denson also observed Hugh Wiggins toss a small handheld radio onto the side of the road, which was recovered by law enforcement the next day. Gonzalez's DNA was

found on the AK-47. Gonzalez was also included as a possible contributor of the DNA found on one of the shotguns. Gonzalez's large red van was recovered behind Gonzalez, Sr.'s trailer. The van contained a package of trash bags, a canister of disinfectant wipes, some scouring pads, and two tires. Gonzalez's fingerprint was recovered from the interior of the back passenger side window of the van.

Dan Blocker, the owner of a tire and automotive business, testified that Gonzalez, Gonzalez, Sr., and Coldiron arrived at his business in Long-Wiggins' red minivan on the day after the murders. Blocker had known Gonzalez for years through servicing vehicles for Gonzalez. On this day, Gonzalez was transporting two wheels in the minivan and asked Blocker to replace the tires on those two rims with another set of tires Gonzalez was also transporting in the minivan. Blocker thought the request was strange because the tires on the rims were better than the replacement tires Gonzalez provided. Gonzalez placed twenty dollars on the counter and told Blocker, "If anyone asks, you haven't seen me." The crime scene technicians had taken photographs of the tire tracks left by the invaders' van in the grass at the Billings' residence. However, there were no discernible tire tread patterns.

Law enforcement obtained records for the phones used by Sumner and Gonzalez. An analysis showed forty-two contacts between them from July 2

- 8 -

through July 10, 2009. The records showed several phone calls being made from each phone on July 9, the day of the murders, but none during the time that the crimes took place or immediately thereafter. There was also a flurry of calls made from each phone between 6:30 p.m. and 7 p.m. on July 9. Testimony from Thornton and Florence established that the group, except for Coldiron, had attempted to take the safe from the Billings' home five days earlier. However, the plan was abandoned after lights came on at the home when the men drove into the driveway.

Gonzalez's mother, Terri Poff, testified that in June or July 2009 Gonzalez was having financial difficulties and that she was helping him pay his bills. Poff had also purchased the large red van and given it to Gonzalez. Gonzalez's wife, Tabatha Gonzalez, testified that she and Gonzalez ran a karate business that failed in 2009. She also testified that the couple was having financial difficulties. In July 2009, Tabatha and Gonzalez both worked at Long-Wiggins' antique business. Gonzalez often drove a red minivan that belonged to Long-Wiggins. In June or July 2009, Gonzalez's mother bought him a larger red van, but it was not in good working condition. Gonzalez left that van with his father Gonzalez, Sr., to perform mechanical work on it. Tabatha also testified that prior to July 2009, Gonzalez met with Mr. Billings to solicit funds for Gonzalez's karate business. Mr. Billings made a $5,000 donation to the couple's self-defense project, but refused to invest

in the business because he thought it was a bad investment. She testified that on the night of July 4, 2009, Gonzalez was with her, their children, and neighbors, shooting off fireworks.

Lonnie Smith and Tony Eisa both testified that Gonzalez had approached them in June or July 2009 about participating in a job or a robbery involving a safe and millions of dollars. Both men refused to participate. Carol Brant, the wife of Gonzalez, Sr., testified that she lived with Gonzalez, Sr., and that the defendant had met with Gonzalez, Sr., several times in the months before the crimes. Brant overheard Gonzalez talking about a robbery and a person who was dealing drugs. She also testified that Gonzalez came over on July 9, but she left shortly after he arrived. The sister of Gonzalez, Sr., testified that she lived near her brother and could see the front of his house from her home. On or about July 9, she saw Gonzalez, Gonzalez, Sr., and three or four other men arrive in three different vehicles. Gonzalez arrived in a red minivan, and the others were in an SUV.

The defense elected not to present any evidence. During jury deliberations, the jury sent two questions to the judge, asking for a magnifying glass and for transcripts of all witness testimony. Over defense objection, the judge provided a magnifying glass to the jury. With the agreement of the parties, the judge instructed the jurors to rely on their recollections of the testimony. On October 28,

- 10 -

2010, the jury found Gonzalez guilty of first-degree murder in the deaths of the Billings and home invasion robbery with a firearm.

The penalty phase proceedings commenced the same day the verdict was returned. The State presented three witnesses related to Gonzalez's 1992 robbery conviction.[1] Gonzalez limited his mitigation witnesses to his mother and his wife. Without objection, the trial court instructed the jury on the following statutory aggravators: prior violent felony, committed in the course of a robbery, committed for financial gain, and that the capital felony was especially heinous, atrocious, or cruel (HAC). Gonzalez requested that the court instruct the jury on the catch-all mitigator. The jury recommended death sentences for both murders by a vote of ten to two.

The trial court conducted a Spencer[2] hearing on December 9, 2010. The State submitted additional victim impact statements. Defense counsel announced that they were prepared to present a number of records (school, military, and psychological reports), but Gonzalez had instructed them not to do so. Gonzalez told the court that he did not want the records offered into evidence. Defense counsel asked the court to take judicial notice of the fact that none of Gonzalez's

---

1. The State also presented a victim impact statement from Ashley Markham.

2. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

codefendants were facing the death penalty.[3]  Gonzalez testified by reading a prepared statement and a "closing statement" after being cross-examined by the State.  In these statements, Gonzalez professed his innocence and his shock that he had been convicted.  Gonzalez's aunt and wife also testified.

On February 17, 2011, the trial court followed the jury's recommendation and sentenced Gonzalez to death for both murders.  The court found the following aggravating factors: prior violent felony conviction (based on the contemporaneous murders of the Billings and the 1992 robbery conviction); committed during the course of a robbery/pecuniary gain (merged); and HAC.  The court rejected all of the statutory mitigators.  The court also rejected the nonstatutory mitigator of disparate sentencing of Gonzalez's codefendants, finding that the disparity in sentencing was due to Gonzalez being more culpable than his codefendants.  The

---

3. Stallworth and Coldiron were found guilty of two counts of first-degree murder and one count of home invasion robbery with a firearm and were sentenced to two consecutive life sentences for the murders and lengthy prison sentences for the robbery.  Thornton and Florence entered guilty pleas to two counts of second-degree murder and home invasion robbery with a firearm.  Thornton was sentenced to concurrent 40-year split sentences for the murders (22 years in prison followed by 18 years' probation) and a concurrent 22-year sentence for the robbery.  Florence received concurrent 45-year split sentences for the murders (24 years in prison followed by 21 years of probation) and a concurrent 24-year sentence for the robbery.  Gonzalez, Sr. and Sumner pled guilty to two counts of second-degree murder and home invasion robbery with a firearm.  Gonzalez, Sr. was sentenced to 17.5 years for each count, to run concurrently.  Sumner received three concurrent 20-year sentences.  Long-Wiggins was convicted in a jury trial of two counts of accessory after the fact to a felony and was sentenced to 28 years and 12 years, to run concurrently.

trial court found three nonstatutory mitigators: Gonzalez was a businessman who served the community and did volunteer service for which he had been commended (some weight); he is a devoted husband, a devoted father to his children, and a father to all children, as evidenced by his community service (little weight); and he came from a broken home, suffered from depression and attention disorder, and was addicted to prescription medicine (little weight). The court concluded that the "three sufficient aggravating circumstances" far outweighed the "insignificant and insufficient" mitigators and sentenced Gonzalez to death for both murders. Gonzalez received a life sentence for the armed home invasion robbery conviction, to run concurrently with the two death sentences.

## ANALYSIS

On appeal, Gonzalez raises thirteen claims of error.[4] We conclude that most

---

4. The claims of error are as follows: the prosecutor made improper remarks during (1) guilt phase opening statements and (2) guilt phase closing arguments; (3) the trial court erred by providing the jury with a magnifying glass during deliberations; (4) the cumulative effect of the guilt phase errors requires reversal of Gonzalez's convictions; (5) the trial court erred in denying Gonzalez's pretrial motions regarding aggravating circumstances; (6) the trial court improperly permitted the State to present testimony about a 1992 robbery during the penalty phase; (7) the penalty phase jury instructions were improper; (8) the prosecutor's penalty phase closing arguments were improper; (9) death is a disproportionate sentence; (10) errors in the trial court's sentencing order require resentencing; (11) capital punishment as presently administered in Florida is unconstitutional based on Ring v. Arizona, 536 U.S. 584 (2002); (12) the cumulative effect of the penalty phase errors requires Gonzalez's sentence to be vacated; and (13) the trial court erred in denying the jury's general request for transcripts without informing them

- 13 -

of his claims are without merit.  Issues 8 and 10 constitute error; however, as discussed below, we conclude that these errors were harmless beyond a reasonable doubt.  We also find that Gonzalez's convictions are supported by competent, substantial evidence.  We address each claim in turn below.

## I. Improper Prosecutorial Comments During Guilt Phase

Gonzalez claims that comments made by the prosecutor during the guilt phase opening and closing arguments were improper, thereby depriving Gonzalez of a fair trial.  Defense counsel posed no objections to any of the prosecutor's comments.  Thus these claims were not properly preserved for appeal.  See Bright v. State, 90 So. 3d 249, 259 (Fla.) (explaining that to preserve a claim of improper comment, counsel must raise an appropriate objection at the time of the comment), cert. denied, 133 S. Ct. 300 (2012).  However, if improper comments constitute fundamental error, they can be considered on appeal even though not preserved by objection.  Merck v. State, 975 So. 2d 1054, 1061 (Fla. 2007); see also Bonifay v. State, 680 So. 2d 413, 418 n.9 (Fla. 1996).  Fundamental error is error that reaches "down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error."  Spencer v.

---

of the possibility of a read-back or asking the jury to specify what transcripts they sought.

State, 842 So. 2d 52, 74 (Fla. 2003) (quoting Brown v. State, 124 So. 2d 481, 484 (Fla. 1960)).

## A. Opening Statement

Gonzalez cites five comments from the opening statement as improper: three in which the prosecutor told the jury that various witnesses had told the truth or would tell the truth at trial and two in which the prosecutor stated that Gonzalez "executed" Mr. Billings by shooting him in the back of the head.

## 1. Vouching for the Truthfulness of Witnesses

The prosecutor made the following comments about the truthfulness of the witnesses during his opening statement:

> Gary [Sumner] had two young kids, Frederick Thornton and Rakeem Florence, that hung around his car cleaning—car detailing business. A[t] the time of the murders, Rakeem Florence was only 17 years old; Frederick Thornton was only 19. . . .
> . . . They've confessed. They have told the truth. And they are going to testify here in this trial, and tell you in detail how this murder happened.
> . . . .
> Now, the proof will show that the defendant in the case was not the smartest person in the world. We've already established that he talked to Lonnie Smith and Tony Eisa about it. He talked to his daddy about it, told him they had a target with a safe with a lot of money. And while he was doing that, his father's ex-wife, who still lived with his father was presen[t]; her name is Carol Brant. She heard them planning a robbery, and she will testify. And she has no involvement, no interest in the case, the proof will show, and her only interest is to tell the truth about the plan that this man and his father had to rob these people.
> . . . .

- 15 -

> Rakeem Florence's mother got on him—he's the one that's 17—and chastised him severely that night. And when she did, <u>he told the truth. He confessed</u>, and told what happened. The same night Frederick Thornton did the same thing as well.
>
> And you'll be able to—the proof will show these young men <u>are very credible and very remorseful</u>.

"It is improper to bolster a witness' testimony by vouching for his or her credibility." <u>Gorby v. State</u>, 630 So. 2d 544, 547 (Fla. 1993). "Improper bolstering occurs when the State places the prestige of the government behind the witness or indicates that information not presented to the jury supports the witness's testimony." <u>Williamson v. State</u>, 994 So. 2d 1000, 1013 (Fla. 2008) (quoting <u>Hutchinson v. State</u>, 882 So. 2d 943, 953 (Fla. 2004)). However, it is not improper for a prosecutor to make comments in opening statement that anticipate the defendant's theory of the case. <u>See, e.g.</u>, <u>Bell v. State</u> (<u>Bell II</u>), 965 So. 2d 48, 56-57 (Fla. 2007) ("Evidence that a witness has received a lighter sentence in exchange for his or her testimony goes to the bias of the witness . . . . The State addressed these matters . . . in anticipation of trial counsel's cross-examination of [the witness]." (citation omitted)); <u>Occhicone v. State</u>, 570 So. 2d 902, 904 (Fla. 1990) (finding no abuse of discretion in overruling defense objection where prosecutor made comments in opening statement in anticipation of insanity defense being used); <u>Bell v. State</u>, 491 So. 2d 537, 538 (Fla. 1986) (finding that the testimony from <u>Bell II</u> above "was offered to take the wind out of the sails of a defense attack on the witness's credibility").

The State's comments regarding Thornton and Florence did just that. The defense's theory was that Gonzalez was not involved in the crimes at all and was set up by the other participants. The defense argued that Thornton and Florence had admitted their involvement in the crimes and would say anything the State wanted them to in order to get lighter sentences. The prosecutor's remarks were a fair statement in anticipation of the defense's theory of the case and, therefore, did not constitute vouching for the witnesses.

Furthermore, the comments were brief and represent the type we have ordinarily characterized as proper. Wade v. State, 41 So. 3d 857, 869 (Fla. 2010) (finding comments about the witness's motive and that witness "told the police the truth" to be proper as part of a "fair reply"); Branch v. State, 952 So. 2d 470, 480 (Fla. 2006) (finding no error in the trial court's rejection of defendant's claim of ineffective assistance of counsel for failing to object to prosecutor's comments that witness "told the truth" and was "careful to tell you the truth"); Marshall v. State, 604 So. 2d 799, 805 (Fla. 1992) (rejecting defendant's claim of vouching where prosecutor asserted during opening statements "that the State had overcome great obstacles in getting inmates to 'truthfully tell what has occurred' "). Comments about Thornton and Florence confessing to the police were based on the facts the prosecutor expected to show and were not improper.

As to the comment regarding Brant, it was proper to tell the jurors that she had no interest in the case and nothing to gain from her testimony as this argument did not place the prestige of the government behind the witness or indicate that information not presented to the jury supported the witness's testimony. Furthermore, "[o]pening remarks are not evidence, and the purpose of opening argument is to outline what an attorney expects to be established by the evidence." Occhicone, 570 So. 2d at 904. Stating that "the proof [would] show" Brant had no ulterior motive was nothing more than a good faith attempt to outline what the prosecutor expected to prove. As such, this claim is meritless.

## 2. "Executed" Comments

The prosecutor also made the following comments that Gonzalez "executed" Mr. Billings:

> Then Gonzalez, Jr., goes into the bedroom and continued to demand, to know where the money was. When [Mr.] Billings wouldn't tell him—he told him he didn't have any money, he shot him in the cheek. Then at the foot of his bed in his bedroom, he was shot behind the head twice <u>and executed</u>.
> . . . .
> . . . I've already indicated, the proof will show that Bud Billings was shot in the legs twice, that he was then carried into his bedroom, that in his bedroom he was shot in the cheek first for telling—for failing to tell—for de[n]ying he had any money, and then he was shot—<u>executed in the back of the head</u> at the foot of his bed while his wife watched in horror.

We have warned that use of the word "exterminate" or any similar term which tends to dehumanize or demonize a capital defendant is improper. <u>See</u>

- 18 -

Bonifay, 680 So. 2d at 418 n.10. However, in Bonifay, we concluded that the prosecutor's singular use of the word "exterminate" did not constitute harmful error. Id. at 418. We find that the prosecutor's comments in this case were proper, as they were based on the fact that Mr. Billings was shot execution-style in the back of the head. The comments also are not the type of "egregious, inflammatory, and unfairly prejudicial" remarks that would require a new trial on the question of Gonzalez's guilt. See, e.g., Urbin v. State, 714 So. 2d 411, 419-22 (Fla. 1998).

## B. Closing Argument

Gonzalez cites three concerns with the prosecutor's closing statement: impermissibly vouching for the credibility of two witnesses, stating facts not in evidence by telling the jury that Gonzalez was trained in karate and therefore capable of using both hands, and commenting on Gonzalez's right to remain silent by disclosing to the jury Gonzalez's statements to the detective who questioned him after the murders. "The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence." Bertolotti v. State, 476 So. 2d 130, 134 (Fla. 1985). Attorneys are permitted wide latitude in closing argument, but that "latitude does not extend to permit improper argument." Gore v. State, 719 So. 2d 1197, 1200 (Fla. 1998). "The control of comments is within the trial court's discretion, and an appellate court will not interfere unless an abuse of such discretion is shown. . . . Each case

- 19 -

must be considered on its own merits, however, and within the circumstances surrounding the complained of remarks." Bonifay, 680 So. 2d at 418 (citations omitted) (quoting Breedlove v. State, 413 So. 2d 1, 8 (Fla. 1982)).

## 1. Bolstering Witness Credibility

During his initial closing argument, the prosecutor made the following comment about the two State witnesses who testified about Gonzalez's involvement in the crimes:

> Again, remember, neither one of the codefendants, Mr. Florence or Mr. Thornton, if they wanted to make up a story, if their idea was to pin this on the defendant, wouldn't you think they would sit there and say, oh, yeah, I saw him point the gun and shoot him, boom, boom, boom. . . . [T]hey are 16- and 19-year-old men who are in the middle of a crime, who will be punished as they should be, but whose testimony is not the kind of testimony that appears fabricated because in essence it could have gone a lot further down the way if they wanted to please us, so to speak. Does everybody understand that? If they wanted to please us and come up with a story, they would have left nothing out there, but they didn't.

Gonzalez asserts that this comment constituted improper bolstering of the credibility of Florence and Thornton. However, as explained in the above analysis of the comments during the opening statement, this did not constitute improper vouching as the prosecutor did not "invoke his personal status as the government's attorney . . . as a basis for conviction of [the] criminal defendant." Ruiz v. State, 743 So. 2d 1, 4 (Fla. 1999). Nor did the prosecutor indicate that information not presented to the jury supported the witnesses' testimony. Additionally, "an

- 20 -

attorney is allowed to argue reasonable inferences from the evidence and to argue credibility of witnesses or any other relevant issue so long as the argument is based on the evidence." Miller v. State, 926 So. 2d 1243, 1254-55 (Fla. 2006). This argument was a fair comment after Gonzalez's cross-examination of Thornton and Florence in which he highlighted their plea agreements with the State. Dailey v. State, 965 So. 2d 38, 44 (Fla. 2007) (holding that the prosecutor's alleged improper vouching for a state witness was a fair comment in response to defense counsel's attack on the witness's credibility).

During the cross-examinations of Thornton and Florence, defense counsel elicited that in return for pleading no contest to two counts of second-degree murder and one count of home invasion robbery, Thornton and Florence were obligated to testify against the other codefendants, including Gonzalez; that the two men were hoping to receive a sentence less than life in prison based on their cooperation, although no promises had been made; and that each of the men had originally lied to their families and to the police about the extent of their involvement in the crimes. Thus, it was proper for the prosecutor to argue that the witnesses' plea agreements with the State should not cause the jury to reject their testimony as incredible. See Wade, 41 So. 3d at 869 (concluding that prosecutor's comments about the witness's truth were proper rebuttal to defendant's argument

- 21 -

that witness was willing to lie for a lighter sentence and were not improper vouching).

## 2. Karate Training Comments

During his rebuttal argument, the prosecutor argued about Gonzalez's karate training:

> And, remember, he's trained in quote, karate. <u>He's a karate person and there's one thing they use both hands</u>. <u>Both hands are used in that situation</u>, so it really doesn't—it's not a factor that should be considered because the testimony is clear in outlining him as the murderer.

During the State's case-in-chief, Gonzalez's wife testified that Gonzalez was left-handed. She also testified that the couple owned a karate school and taught self-defense classes to women and children. During the closing argument, defense counsel argued that Gonzalez was not the shooter and emphasized that the video footage showed the Billings' assailant holding the gun in his right hand. In response, the prosecutor argued that the video of the shooter holding the gun in his right hand did not mean that Gonzalez was not the shooter. The prosecutor noted that Gonzalez was trained in karate and, as such, could have been proficient using either hand. The prosecutor's comments were properly based on facts in evidence. Further, the comments were in fair reply to the defense counsel's argument. Accordingly, there is no error. <u>Williamson</u>, 994 So. 2d at 1013.

## 3. Commenting on Right of Silence

- 22 -

Also during the rebuttal argument, the prosecutor discussed Gonzalez's interview with Deputy Bill Chavers:

> His own words are confirmation because his own words place him at Wal-Mart and when he places himself at Wal-Mart and Chavers asked him, <u>Who are you with? I'm not going to say. I'm not going to tell you</u>. When he says he sees something disturbing in the red van. <u>What's in there? I'm not going to tell you, I'm not going to say. When he talks about aspects of the crime, he shuts down and will not talk about it</u>. Confirmation by his own words also come into play in this situation. Because his own words, I'm in deep, I'll take the heat.

This Court has said that "[c]ommenting on the defendant's exercise of his right to remain silent is serious error." <u>Rimmer v. State</u>, 825 So. 2d 304, 322 (Fla. 2002). "The test to be applied in such instances is whether the statement is fairly susceptible of being interpreted by the jury as a comment on the defendant's failure to testify." <u>Id.</u> However, the prohibition against commenting on a defendant's silence does not apply when the defendant does not invoke his Fifth Amendment right. <u>Hutchinson v. State</u>, 882 So. 2d 943, 955 (Fla. 2004), <u>abrogated on other grounds by</u> <u>Deparvine v. State</u>, 995 So. 2d 351 (Fla. 2008); <u>Connor v. State</u>, 979 So. 2d 852, 860 (Fla. 2007) (finding no comment on right of silence where detectives testified that defendant had answered some questions but failed to respond to more specific questions because defendant did not invoke his Fifth Amendment right to remain silent).

In the instant case, before Deputy Chavers questioned Gonzalez, he read Gonzalez his Miranda[5] rights. Gonzalez did not invoke his right to remain silent and agreed to talk with Deputy Chavers. During his trial testimony, Deputy Chavers stated that Gonzalez admitted that he went to Wal-Mart with two friends on the day of the murders (as depicted on the Wal-Mart security video), but Gonzalez refused to identify them. Gonzalez also told Deputy Chavers that after the murders he received a frantic call from his father stating that Gonzalez, Sr., had to move the red van that Gonzalez had previously parked at his father's house. Gonzalez stated he found his father cleaning out the red van in the rear of his yard, but would not tell the deputy what he saw in the van. The defense offered no objections to Deputy Chavers' testimony or to the prosecutor's closing argument quoted above.

Because Gonzalez did not invoke his Fifth Amendment right to remain silent, his refusal to answer several questions during the police interrogation did not preclude the State from admitting the evidence of his refusal or commenting on it during closing argument. See Downs v. State, 801 So. 2d 906, 911 (Fla. 2001) ("[W]here a defendant refuses to answer one question out of many during a lengthy interrogation following the defendant's waiver of his constitutional rights, the State

_____

5. Miranda v. Arizona, 384 U.S. 436 (1966).

is not precluded from subsequently admitting evidence of the defendant's silence at trial."). This claim is without merit.

## II. Magnifying Glass During Jury Deliberations

Gonzalez claims that the trial court reversibly erred in allowing the jury to have a magnifying glass during jury deliberations after the jury requested one. The defense objected, arguing that the jury should take the evidence as presented to them. The judge did not inquire of the jury regarding the reason for the request.

As a general rule, it is improper to allow materials into the jury's deliberation room that have not been admitted into evidence if the materials are of such character as to influence the jury. See Smith v. State, 95 So. 2d 525, 528 (Fla. 1957) (holding that it was reversible error to permit the jury to use a dictionary while deliberating its verdict); Johnson v. State, 9 So. 208, 213 (Fla. 1891) (finding reversible error when jury was allowed to have law books in deliberation room). However, it is not per se reversible error when any unauthorized materials are present in the jury room. Rather, where an objection is raised, Florida courts have applied a harmless error analysis. See State v. Hamilton, 574 So. 2d 124, 129-30 (Fla. 1991) (discussing the proper standard as harmless error); Keen v. State, 639 So. 2d 597, 599 (Fla. 1994) (stating that "[t]his Court adopted the harmless error test" to determine the effect of unauthorized materials in the jury room during deliberations).

Gonzalez argues that because the magnifying glass was not in evidence and had not been used in the course of the trial to examine evidence, the jury's use of the magnifying glass was erroneous. The State argues that evidence sent into the deliberation room today often requires the use of technology or equipment, not itself introduced into evidence, for the jury to meaningfully consider the evidence. The State points to the examples of a television, DVD player, or a VCR to view a surveillance tape, a CD player to listen to a defendant's interview with the police, and rubber gloves to inspect evidence spattered with a victim's blood. The State argues that nothing about a magnifying glass is of such a character as to influence the jury in reaching a verdict; instead it allows jurors to fully and fairly consider documents or items that were introduced into evidence.

Only two Florida cases mention a jury's request for a magnifying glass. See Kramer v. State, 882 So. 2d 512, 512 (Fla. 4th DCA 2004) (holding that trial judge's response to jury's request for a magnifying glass without informing either the State or the defendant of request was outside the express notice requirements of Florida Rule of Criminal Procedure 3.410, but was harmless error); Jackson v. State, 832 So. 2d 932, 933 (Fla. 3d DCA 2002) (stating, although not at issue, the fact that the jury asked for and was provided a magnifying glass, with no objection, to examine pictures of victim's injury). Neither decision addresses whether it is proper for a jury to be provided with a magnifying glass during deliberations.

However, a number of federal courts have concluded that providing a jury with a magnifying glass is not error.

In United States v. Brewer, 783 F.2d 841 (9th Cir. 1986), the defendant argued that the jury's use of a magnifying glass, without court approval, to examine the photographic evidence required reversal of his conviction because the magnifying glass was not admitted into evidence and was extrinsic evidence considered by the jury. Id. at 843. The Ninth Circuit Court of Appeals rejected the characterization of the magnifying glass as extrinsic evidence. Id. The court noted that there was no contention that the jurors considered the magnifying glass itself to have any bearing on the case. Id. In refusing to set aside the verdict, the Ninth Circuit stated that it was "unable to see how the use of the magnifying glass to view photographs differs from the use of corrective eyeglasses by jurors." Id. See also Evans v. United States, 883 A.2d 146, 151-52 (D.C. Cir. 2005) (finding no error because "the use of a magnifying glass by jurors for exhibits properly introduced at trial is within the trial court's discretion"); United States v. Holmes, 30 Fed. App'x 302, 310 (4th Cir. 2002) (rejecting claim that jury's use of magnifying glass during deliberations was improper because "the mere making of a more critical examination of an exhibit than was made during the trial is not objectionable"); United States v. George, 56 F.3d 1078, 1084 (9th Cir. 1995) (holding that no "new evidence" resulted from jurors' use of magnifying glass to

examine fingerprint cards and gun); <u>United States v. Young</u>, 814 F.2d 392, 396 (7th Cir. 1987) ("[B]y providing the jury with a magnifying glass, the district court permitted the jury to make a more critical examination of the exhibits introduced at trial."). We find these federal cases persuasive and conclude that the trial court did not err in providing a magnifying glass to the jury, upon its request, as a means for the jury to presumably make a more critical examination of the evidence.

### III. Trial Court's Denial of the Jury's Request for Transcripts

In his supplemental brief, Gonzalez contends that he is entitled to a new trial based on the trial court's denial of the jury's request during deliberations for "transcripts of what the witnesses said." The trial judge asked the parties for their responses to this request. The State responded that the judge should tell the jury that the transcripts were not available and they should rely on their memory and the evidence. Defense counsel agreed, stating that the "case law is clear that they have to rely upon what was heard during trial." When the jury was brought back into the courtroom, the judge denied the request for transcripts and stated, "There will be no transcripts available to you. You will have to rely on your own recollections and memories of what the witnesses testified to." Gonzalez now argues that the judge's failure to inform the jury of the possibility of a read-back or instruct them to specify what transcripts were sought constitutes error based on our recent decision in <u>Hazuri v. State</u>, 91 So. 3d 836 (Fla. 2012). To overcome defense

- 28 -

counsel's failure to object or request such an instruction, Gonzalez asserts that the failure to so instruct the jurors constituted fundamental error.

In Hazuri, we set forth several rules regarding transcript requests by the jury. First, a trial court cannot use any language that would mislead a jury into believing that read-backs are prohibited. Id. at 846. Second, when a jury requests trial transcripts, the trial judge should deny the request, but inform the jury of the possibility of a read-back. Id. Third, when a jury makes a general request for trial transcripts, it is incumbent on the trial judge to instruct the jury to specify the trial testimony sought to be reviewed so that the judge may properly exercise his or her discretion in granting, denying, or deferring any read-back requests. Id. In Hazuri, the judge responded to the jury's request by informing the jury that it could not have the transcripts and each juror must rely on his or her own recollection of the evidence. Id. at 839. Defense counsel argued that the jury should be informed of the opportunity for a read-back, even though they were not able to receive trial transcripts of the trial. Id. Over the defense's objection, the trial judge denied the request, did not inform the jury of the read-back option, and did not clarify which specific portion of testimony the jury was seeking to review. Id. at 847. We concluded that this was reversible error and that Hazuri was entitled to a new trial. Id.

Although we decided <u>Hazuri</u> after Gonzalez's trial occurred, he still receives the benefit of that decision because his case is not yet final. <u>Smith v. State</u>, 598 So. 2d 1063, 1066 (Fla. 1992) ("[A]ny decision of this Court announcing a new rule of law, or merely applying an established rule of law to a new or different factual situation, must be given retrospective application by the courts of this state in every case pending on direct review or not yet final."); <u>Wuornos v. State</u>, 644 So. 2d 1000, 1007 n.4 (Fla. 1994) ("We read <u>Smith</u> to mean that new points of law established by this Court shall be deemed retrospective with respect to all non-final cases unless this Court says otherwise."). However, unlike defense counsel in <u>Hazuri</u>, Gonzalez's defense counsel did not object to the judge's instruction to the jury in this case. <u>Smith</u>, 598 So. 2d at 1066 ("To benefit from the change in law, the defendant must have timely objected at trial if an objection was required to preserve the issue for appellate review."). In fact, Gonzalez's counsel expressed agreement with the way the transcript request was handled. Under the invited-error doctrine, a party may not make or invite error at trial and then take advantage of the error on appeal. <u>Terry v. State</u>, 668 So. 2d 954, 962 (Fla. 1996). Accordingly, Gonzalez is not permitted to take advantage of this invited error.

Even if Gonzalez had not invited the error, the judge's actions would not constitute fundamental error in this case. In <u>Hendricks v. State</u>, 34 So. 3d 819 (Fla. 1st DCA 2010), the First District Court of Appeal found that, assuming error in the

- 30 -

judge's failure to inform the jury of a read-back,[6] such error was not fundamental. Id. at 830-32. In that case, the jury requested to "see" the transcript of a specific portion of testimony. Id. at 821. In response, the judge stated, outside the presence of the jury, "I think the answer is no, rely on your memory." Id. After no response from the attorneys regarding this statement, the judge instructed the jury accordingly. Id. The district court cited Farrow v. State, 573 So. 2d 161 (Fla. 4th DCA 1990), for the principle that finding fundamental error under similar circumstances would encourage gamesmanship, as defense counsel may strategically choose not to object, await the outcome of the trial, and if unfavorable, secure a certain reversal on appeal because of the " 'fundamental' error which the judge committed." Hendricks, 34 So. 3d at 831 (quoting Farrow, 573 So. 2d at 163). Due to the possibility of this strategic gamesmanship, the First District declined to find fundamental error. Id. The scenario in the instant case is very similar to that in Hendricks. Thus, even if Gonzalez's claim was not barred by the invited error doctrine, he still would not be able to show fundamental error and is therefore not entitled to relief.

## IV. Cumulative Effect of Guilt Phase Errors

Gonzalez contends that the cumulative effect of the alleged errors during the guilt phase deprived him of a fundamentally fair trial and he is entitled to a new

---

6. The First District decided Hendricks before our decision in Hazuri established that such a failure does in fact constitute error.

trial.  However, we have repeatedly held that where the alleged errors, when viewed individually, are "either procedurally barred or without merit, the claim of cumulative error also necessarily fails."  Armstrong v. State, 73 So. 3d 155, 174 (Fla. 2011) (quoting Israel v. State, 985 So. 2d 510, 520 (Fla. 2008)), cert. denied, 132 S. Ct. 2741 (2012).  Because Gonzalez has failed to demonstrate a basis for relief on any of the above claims, we deny his claim of guilt phase cumulative error.

### V. Denial of Gonzalez's Pretrial Motions Regarding Aggravators

Gonzalez contends that the trial court erred in denying his pretrial motions regarding aggravating circumstances.  Gonzalez first filed a motion to compel the State to provide a bill of particulars as to the aggravating circumstances it would be relying on in the penalty phase of the trial, arguing that the indictment failed to sufficiently inform him of the particulars of the offense relevant to the imposition of the death penalty.  He also filed a pretrial motion to require the State to elect which aggravators it intended to argue to the jury.  In its response, the State cited our decision in State v. Bloom, 497 So. 2d 2 (Fla. 1986), in which we noted that "under Florida's statutory scheme the [S]tate need not divulge before trial the specific statutory aggravating factors it intends to prove at a sentencing hearing." Id. at 3.  The State also cited Sireci v. State, 399 So. 2d 964 (Fla. 1981), in which we concluded that the State's failure to notify the defendant prior to trial of the

aggravating circumstances it intended to prove did not deny the defendant due process. Id. at 970. At a pretrial hearing, the court denied the motions under the authority of Bloom.

Gonzalez claims that the trial judge erroneously believed that he was required to deny the defense motions based on Bloom. Gonzalez points to the failure of both the State and the trial court to recognize or cite our subsequent decision in State v. Steele, 921 So. 2d 538 (Fla. 2005), which held that a trial court does not depart from the essential requirements of law by requiring the State to provide pre-penalty phase notice of aggravating factors. Id. at 542-44.

First, we note that Gonzalez himself also failed to bring our decision in Steele to the trial court's attention. Second, there is no record evidence that the trial judge felt compelled by Bloom to rule in the manner he did. Third, Steele stands for the proposition that the trial court has discretion in determining whether the State should provide notice of the aggravators it intends to prove. Id. at 542-43 (stating the question presented as "whether a judge may require such notice without violating a clearly established principle of law" (emphasis added)). "Whether to require the State to provide notice of alleged aggravators is within the trial court's discretion." Id. at 543. As such, the question presented here is whether the trial court abused its discretion in denying Gonzalez's request for a bill

of particulars as to the aggravating circumstances that the State intended to prove at trial.

We have consistently held that because Florida's death penalty statute "limits aggravating factors to those listed, . . . there is no reason to require the state to notify defendants of the aggravating factors that the state intends to prove." Hitchcock v. State, 413 So. 2d 741, 746 (Fla. 1982) (citation omitted); see also Kormondy v. State, 845 So. 2d 41, 54 (Fla. 2003); Lynch v. State, 841 So. 2d 362, 378 (Fla. 2003); Cox v. State, 819 So. 2d 705, 725 (Fla. 2002); Vining v. State, 637 So. 2d 921, 927 (Fla. 1994). Furthermore, Gonzalez has not claimed that he was prejudiced in the preparation of his case by the aggravators offered. Accordingly, he cannot show that the trial court abused its discretion in denying his motions relating to disclosure of the aggravating circumstances.

## VI. Penalty Phase Testimony Regarding the 1992 Robbery Conviction

Gonzalez asserts that the trial court improperly permitted the State to present evidence and testimony relating to a 1992 robbery during the penalty phase of trial because such testimony was irrelevant to the proceedings. Prior to the presentation of this evidence, the defense objected that the offense was too remote in time to be relevant to anything being considered during the penalty phase and the evidence should be excluded. The defense also objected that consideration of the robbery as an aggravating factor would constitute improper doubling of the robbery

aggravator. The State responded that it was entitled to introduce evidence of all robberies the defendant had been convicted of as this would go to the weight to be accorded to that one aggravating factor. The court overruled the objections and permitted the testimony.

The State introduced a copy of the judgment and sentence into evidence. The State also presented testimony from the victim of the robbery, who was a gas station clerk at the time. He testified that Gonzalez grabbed some packages of cigarettes and attempted to leave the store without paying for them. The victim approached Gonzalez and asked him to pay. Gonzalez then placed the victim in a head lock and dragged him out of the store into the parking lot. Gonzalez repeatedly struck the victim on the head, including two blows to his face. Gonzalez also yelled that he was going to kill the victim. The victim was able to get free when he struck Gonzalez in the groin. Gonzalez then ran across the street, started flexing his muscles, and "pumping himself up." Fearing that Gonzalez would attack him again, the victim went into the store, locked the door, and called the police, who apprehended Gonzalez.

During a penalty phase proceeding, the trial court has the discretion to admit evidence with regard to the details of a defendant's previous conviction for a felony involving the use or threat of violence. See § 921.141(1), (5)(b), Fla. Stat. (2009); Miller v. State, 42 So. 3d 204, 225 (Fla. 2010). We review the admission

or exclusion of such evidence for an abuse of discretion. Miller, 42 So. 3d at 225; San Martin v. State, 717 So. 2d 462, 470-71 (Fla. 1998). "In determining whether a trial court has abused its discretion in admitting evidence of prior violent felony convictions, this Court looks at the tenor of the witnesses' testimony and whether this testimony became a central feature of the penalty phase." Franklin v. State, 965 So. 2d 79, 96 (Fla. 2007).

Gonzalez argues that the trial court erred in admitting this testimony because the remoteness and the non-life-threatening nature of the 1992 robbery made the offense irrelevant to the consideration of the prior violent felony aggravator. However, we have held that "because the death penalty statute is silent as to the time or place of the previous conviction, even a conviction remote in time may properly be considered as aggravating." Kelley v. Dugger, 597 So. 2d 262, 264 (Fla. 1992); see also Thompson v. State, 553 So. 2d 153, 156 (Fla. 1989) (concluding that a 1950 rape conviction established valid prior violent felony aggravating circumstance in sentencing for a 1982 murder); Rose v. State, 787 So. 2d 786, 800-01 (Fla. 2001) (finding prior violent felony based on a 1969 breaking and entering conviction in a 1998 resentencing). Gonzalez's remoteness claim is without merit.

Gonzalez is correct that the prior violent felony aggravator only attaches "to life-threatening crimes in which the perpetrator comes in direct contact with a

human victim." Mahn v. State, 714 So. 2d 391, 399 (Fla. 1998) (quoting Lewis v. State, 398 So. 2d 432, 438 (Fla. 1981)). However, "[w]hether a crime constitutes a prior violent felony is determined by the surrounding facts and circumstances of the prior crime." Spann v. State, 857 So. 2d 845, 855 (Fla. 2003); Anderson v. State, 841 So. 2d 390, 407 (Fla. 2003); Rose, 787 So. 2d at 800-01. Furthermore, when presenting evidence in support of the prior violent felony aggravating circumstance, "the State is not restricted to the bare admission of a conviction." Miller, 42 So. 3d at 225. Rather, the State may present any evidence that the trial court "deems relevant to the nature of the crime and the character of the defendant and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (5) and (6)" of the statute. See § 921.141(1), Fla. Stat. (2009).

"If a defendant was previously convicted of any violent felony, any evidence showing the use or threat of violence to a person during the commission of such felony would be relevant in a sentence proceeding." Delap v. State, 440 So. 2d 1242, 1255 (Fla. 1983). As we have explained, "[t]estimony concerning the events which resulted in the conviction assists the jury in evaluating the character of the defendant and the circumstances of the crime so that the jury can make an informed recommendation as to the appropriate sentence." Rhodes v. State, 547 So. 2d 1201, 1204 (Fla. 1989). Such testimony would also be relevant in

- 37 -

determining what weight to give to the prior violent felony aggravator. <u>Seibert v.</u>

<u>State</u>, 64 So. 3d 67, 79 (Fla. 2010).

In <u>Mahn</u>, the defendant was merely the driver of a vehicle used after his

friend snatched a woman's purse in a parking lot. 714 So. 2d at 394. Thus, the

defendant's prior robbery charge did not qualify as a prior violent felony. <u>Id.</u> at

399. Further, unlike in this case, the evidence there did not indicate that Mahn had

<u>exerted any force</u> against the robbery victim. <u>Id.</u> at 394. We conclude that

Gonzalez's claim that the 1992 robbery was not a violent crime has no merit

because Gonzalez physically attacked the victim, repeatedly struck him in the head

and face while threatening to kill him, and engaged in further threatening behavior

from across the street after the victim had escaped. The admitted testimony in this

case was relevant to the proceeding.

Gonzalez cannot show that the trial court abused its discretion by admitting

evidence of the 1992 robbery conviction—the admitted testimony did not become

the central feature of the penalty phase, and the witnesses testified in a very matter-

of-fact manner, without using emotional language. <u>Franklin</u>, 965 So. 2d at 96.

Nor was the robbery so remote in time or of such a non-life-threatening nature as

to be irrelevant to the instant case. The trial court did not abuse its discretion in

allowing the State to introduce the arrest report identifying Gonzalez as the

assailant in the 1992 robbery, the testimony of the victim as to the details of the robbery, or any other testimony regarding the crime.

Gonzalez also asserts that he was affirmatively misled by the State's response to his death penalty motions. In its response to Gonzalez's pretrial motion to declare the prior violent felony aggravator unconstitutional, the State represented that the aggravator did not apply to the facts of the case and would not be argued by the State. Gonzalez withdrew the motion based on the State's response, and the prosecutor stated that he would advise defense counsel if the State's intentions changed.

Gonzalez's claim on this point is also meritless. This evidence was being presented at the penalty phase. At that point, Gonzalez had already been convicted for the contemporaneous murders of the Billings. Under Florida law, such contemporaneous convictions can serve as an appropriate basis for the prior violent felony aggravator. See Pham v. State, 70 So. 3d 485, 495 (Fla. 2011); Mahn, 714 So. 2d at 399. Therefore, regardless of the State's assertions, Gonzalez was on notice that the aggravator could be offered in his case. Kormondy, 845 So. 2d at 54 (finding that notice of the aggravating factors the State intends to argue is not required); Hitchcock, 413 So. 2d at 746 (finding that Florida's death penalty statute limits aggravators to those listed in the statute such that "there is no reason to require the state to notify defendants of the aggravating factors that the state

- 39 -

intends to prove" ). Gonzalez's claim that the trial court improperly allowed the State to admit evidence of his conviction for the 1992 robbery is without merit.

## VII. Improper Penalty Phase Closing Argument by Prosecutor

Gonzalez contends that he is entitled to a new sentencing proceeding based on various comments that the prosecutor made during closing arguments in the penalty phase. The comments can be characterized as (1) reference to the victims' children being present in the house; (2) creation of an "imaginary script" or "Golden Rule" argument; (3) mitigation referred to as aggravation; (4) "double murder" as an aggravating circumstance; (5) shot Mr. Billings "like a dog"; and (6) denigration of the role of the jury. Gonzalez only objected to the comment regarding mitigation. As such, most of these claims were not preserved for appeal. See Bright, 90 So. 3d at 259 (explaining that in order to preserve a claim of improper comment, counsel must raise an appropriate objection at the time of the comment). The one comment that was preserved by an objection is reviewed for an abuse of discretion by the trial court. Merck, 975 So. 2d at 1061 ("A trial court has discretion in controlling opening and closing statements, and its decisions will not be overturned absent an abuse of discretion."). Unobjected-to comments are grounds for reversal only if they rise to the level of fundamental error. Id. To constitute fundamental error, "improper comments made in the closing arguments of a penalty phase must be so prejudicial as to taint the jury's recommended

- 40 -

sentence." Thomas v. State, 748 So. 2d 970, 985 n.10 (Fla. 1999). Each of the challenged comments will be discussed in turn below.

## A. Reference to Children Being Present

Gonzalez claims that the prosecutor's repeated mention of the children's presence in the Billings' home was not supported by the record and created a nonstatutory aggravating circumstance. Gonzalez posed no objections to these comments and must show that the comments constituted fundamental error to obtain relief. The challenged comments are quoted below:

> This wasn't just any robbery, the man was there, his wife was there and nine children were scattered throughout the house. . . . So that is an aggravating factor in terms of considering just how bad this robbery is.
> . . . .
> . . . Mr. Billings and his wife and family were at home Thursday afternoon, had not gotten dark, but they were in the casual mode, kids were scattered around the house and as he's relaxing in his home, . . . Stallworth kicks the door in . . . . Mr. Billings has got shot two times in the leg, he's obviously in severe pain, he knows the children are in the house running around, were running around all over the house. . . .
> . . . .
> Let's talk about Mrs. Billings. . . . She's in the—and you have seen this in the video, she's in the living room and she's in the video when this man has her husband by the throat with a gun to his head and has shot him in the leg two times and has asked him where is the money, where is the money and then he says to her, [w]here is the bedroom? Now, while this is happening their children are all around. There are nine children in that house with special needs. She knew that.
> . . . .
> . . . The evidence shows that Melanie Billings was terrorized in her home for several minutes before she was killed. It demonstrates,

- 41 -

> the evidence clearly shows, that in that home with her were nine of her children that had disabilities.  At some point, at some point, Melanie Billings fearfully wondered, [w]hat will happen to my children, my precious children.
>
> I suggest to you that in this case each individual decision should be that the aggravators outweigh the mitigators and that the proper and just recommendation is a recommendation for death.

"[T]he proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence." Bertolotti, 476 So. 2d at 134.  "A prosecutor may make comments describing the murder where these comments are based on evidence introduced at trial and are relevant to the circumstances of the murder or relevant aggravators, so long as the prosecutor does not cross the line by inviting the jurors to place themselves in the position of the victim." Mosley v. State, 46 So. 3d 510, 521 (Fla. 2009).  Here, the prosecutor did not comment on the children's presence as a nonstatutory aggravating factor, but rather as being relevant to the HAC and "murder in the course of a robbery" aggravators and the weight given to them.

The prosecutor could properly argue that this was not an "ordinary" robbery because the victims' home was invaded while their children were present.  The Billings' adult daughter, Ashley Markham, testified that her parents and nine disabled children (ages four through eleven) lived in the home.[7]  The testimony

--------

7. Markham testified that all of the children had disabilities, without objection from the defense.  When the prosecutor asked about the type of

also showed that two of the children, Jake and Adrianna, were aware of the invasion as it occurred. Finally, Thornton testified that he saw children in the living room when he kicked in the door and entered the home. Accordingly, the prosecutor's comments about the children were consistent with the evidence and the fair inferences from that evidence. Furthermore, the comments were relevant to the HAC aggravator as they demonstrate the terror Melanie Billings faced knowing that her children were present. James v. State, 695 So. 2d 1229, 1235 (Fla. 1997) ("[F]ear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel."). There was no error, much less fundamental error, in mentioning the presence of the children.

### B. "Imaginary Script" Argument

An "imaginary script" is a subtle form of a "golden rule" argument in which the prosecutor asks the jury to put the prosecutor's "own imaginary words in the victim's mouth," thereby "trying to 'unduly create, arouse and inflame the sympathy, prejudice and passions of [the] jury to the detriment of the accused.' " Urbin, 714 So. 2d at 421 (quoting Barnes v. State, 58 So. 2d 157, 159 (Fla. 1951)). Gonzalez asserts that the prosecutor's comment about Mrs. Billings' thoughts regarding the fate of her children was particularly egregious because it appealed to

disabilities, the defense objected on the grounds of relevancy. The trial court sustained the objection.

the passions of the jury and asked the jurors to put themselves in the victim's position. We have found penalty phase arguments to be improper where they invited the jury to imagine the pain and suffering of the victim. See Urbin, 714 So. 2d at 421 (concluding that imaginary script where prosecutor stated victim died pleading for his life was impermissible argument).

Here, the prosecutor created an imaginary script in which Mrs. Billings "fearfully wondered, [w]hat will happen to my children, my precious children." While the evidence showed that the children were present in the house, the imaginary script speculated about the victim's final thoughts and invited the jurors to place themselves in the position of the victim "fearfully" wondering what would happen to her children. This was error. However, Gonzalez did not object at trial to this "imaginary script" comment. Thus, we apply fundamental error review. Brooks v. State, 762 So. 2d 879, 899 (Fla. 2000).

In McDonald v. State, 743 So. 2d 501 (Fla. 1999), the prosecutor argued that the defendants gagged the victim because "he was crying out for mercy" and asked the jury to imagine the victim's suffering as he heard the water run into the bathtub where he was drowned, imagine the victim's suffering if the defendants did not hold him down in the tub as he was hog tied, imagine the victim "drowning face down, not able to get up, not able to do anything but rock and roll," and imagine the ordeal that the victim went through. Id. at 504-05. We found the prosecutor's

remarks to be "ill-advised," but they did "not rise to the level of fundamental error." Id. at 505. We noted that the jury was well aware of the facts of the case, having heard testimony from the victim's fiancée who discovered the body and having viewed pictures of the victim and the condition of the bathroom in which he was found. Id. As such, we did not believe "that the prosecutor's comments so tainted the jury's verdict so as to warrant a new penalty phase proceeding." Id.; see also Braddy v. State, 111 So. 3d 810, 850 (Fla. 2012) (concluding that the unobjected-to imaginary script, "Where's mommy? Where's mommy?" illustrated confusion of child victim before her death, but did not constitute fundamental error given the "totality of evidence presented regarding the circumstances of [her] death"), cert. denied, 134 S. Ct. 275 (2013).

In the instant case, the jury was well aware of the facts of the case, including that there were nine children present in the house at the time of the murders. Here, the comment was not even as descriptive or direct as those in McDonald, which did not constitute fundamental error. "Given the totality of the evidence presented regarding the circumstances of [the victims'] death[s]," this one-sentence imaginary script does not constitute fundamental error. Braddy, 111 So. 3d at 850.

### C. Mitigation Referred to as Aggravation

Gonzalez claims that the prosecutor made improper comments in which he equated the mitigating circumstances with an aggravating circumstance. Gonzalez

- 45 -

objected to the prosecutor's argument, and the trial court overruled the objection with an explanation to the jury. Because Gonzalez preserved this claim, the trial court's ruling is reviewed for an abuse of discretion. The exchange regarding this comment is quoted below:

> STATE: What the Defense has proven this morning is that this Defendant had every opportunity. He had a good, loving mother that provided him with love, support, direction, positive direction and he had a loving wife that put up with his addiction to pain killers and his inability to make a living. He was taught to respect others. He was taught the principles of Taekwondo his whole life. He was taught to have integrity. This wasn't some poor person that had no conception of right and wrong. This was a man that knew beyond every shadow of a doubt how to respect people. He observed that from his mother. He was taught that. He taught children to have respect [for] others, to have integrity. So I submit to you that is an aggravating circumstance, a man that had everything he needed to be successful in life and made a conscious—
>
> DEFENSE: Judge, I apologize, but I have to object to that. He's characterized this as an aggravating factor. It is not. It is a misstatement of the law.
>
> COURT: I'm going to overrule the objection. The jury is mindful of my earlier instruction to you that what the attorneys say during the course of these arguments is not evidence in the case nor is it your instruction on the law. The instruction on the law that will follow contains what are the aggravating circumstances that the law permits you to consider. You may continue, [Prosecutor].
>
> STATE: Let me be real clear. The evidence this morning that shows that he had opportunity to live a respectful, law-abiding life is not mitigating circumstances. I submit the evidence does not demonstrate that that is a mitigating circumstance.

- 46 -

It is improper argument to characterize the offered mitigating evidence as an aggravating factor. See Zack v. State, 911 So. 2d 1190, 1208 (Fla. 2005) ("The only matters that may be considered in aggravation are those set out in the death penalty statute."). However, we have rejected similar claims that comments like these in the instant case are improper. Braddy, 111 So. 3d at 854-55 (finding no error where prosecutor made several comments regarding mitigation, including that defendant was "privileged to be from this family" and that his "family highlights . . . the fact that the aggravators outweigh the mitigators"); Ford v. State, 802 So. 2d 1121, 1131-32 & n.18 (Fla. 2001) (finding no abuse of discretion where prosecutor said testimony of defendant's family and friends "makes the crime itself that he committed even worse"); Moore v. State, 701 So. 2d 545, 551 (Fla. 1997) (finding no abuse of discretion where prosecutor said of defendant's mitigation, "[I]t may sound like mitigation, but . . . I would submit to you that it's the most aggravating factor of all"). Here, the trial court told the jury it would be instructed on which aggravators it could consider, which was akin to giving a curative instruction, and the prosecutor further clarified his argument. Also, as was true in the above cases, the court properly instructed the jury as to the aggravators they could consider. Gonzalez is not entitled to relief as to this claim.

### D. "Double Murder" as an Aggravating Circumstance

Gonzalez claims that the prosecutor improperly argued that the murder of two victims constituted an aggravating circumstance. Gonzalez posed no objection to these comments and must show that the comments constituted fundamental error to obtain relief. The arguments cited by Gonzalez are quoted below:

> I'll tell you now, by your finding yesterday, you have already found two aggravating facts. One, that this was commit[ted] in the course of the robbery and another one, that it was committed after another capital crime had been committed. In other words, because two people were killed, that is an aggravating factor and you will need to consider that and again, I'll come back and talk to you a little bit more in detail about that, but in deciding whether or not to recommend death for Byrd Billings, you will need to consider the fact that he also killed Melanie Billings and likewise, when you are considering the aggravating facts for Melanie Billings, you will have to consider and acknowledge the fact that an aggravating factor is that he killed Byrd Billings. So those two have already been found by you beyond a reasonable doubt. So we have met our burden of establishing at least two aggravating facts. . . .
>         . . . .
>         . . . In order to consider the death penalty as a possible penalty, you must determine that at least one aggravating circumstance has been proven. The reason that I put that up there for you is to make sure you understand clearly that you have already found beyond a reasonable doubt two aggravating circumstances: Robbery, this murder occurred during the course of a robbery and this was a double murder.
>         . . . .
>         Now, I'm ready now to discuss with you the aggravating circumstances. As it relates to Byrd Billings, there are five circumstances that really will be combined into three. The first one is that the murder was committed during a robbery. The second one is that murder was committed for financial gain and even though those are separate aggravating circumstances listed and the judge will read them to you separately, if you find one of them present, which you have already done, you really—I don't get credit for both of them if you understand what I'm saying. The robbery and the financial gain

- 48 -

merges together and you really consider them as one. Now, in addition to that, number three, the murder was committed during another capital felony, and that is what I explained to you earlier, that there is double murder and the Defendant was previously convicted—number four is that he was previously convicted of a felony involving the use of violence to the person and that is the strong-arm robbery that we introduced evidence of this morning that happened when he was 18 years-old.

Again, we have already established number three that by your verdict beyond a reasonable doubt. So number four kind of merges into number three although it is additional evidence of an aggravating factor, it only gets one aggravating factor and that is that the murder was committed . . . during another capital felony or a crime of violence. . . .

. . . .

And then he was previously convicted of another felony involving the use of violence, that is the one we had this morning. That one speaks for itself. He was convicted of it. We proved it beyond a reasonable doubt, but it pales in comparison really to the fact that he committed two murders instead of one and I would urge you to place great emphasis and great weight on that aggravator.

. . . .

. . . In summary, their mitigating circumstances does not come close to the aggravating circumstances that you have already found in this case, both the robbery and the double murder killing of two people instead of one.

While the prosecutor's argument about the contemporaneous murder convictions was not as artful as it could have been, it is obvious that the prosecutor cited the murders as additional evidence supporting the prior violent felony aggravator, which is entirely proper. Section 921.141(5)(b), Florida Statutes (2009), provides that it is an aggravating circumstance if "[t]he defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person." We have repeatedly held that "where a defendant

- 49 -

is convicted of multiple murders, arising from the same criminal episode, the contemporaneous conviction as to one victim may support the finding of the prior violent felony aggravator as to the murder of another victim." Bevel v. State, 983 So. 2d 505, 517 (Fla. 2008) (quoting Francis v. State, 808 So. 2d 110, 136 (Fla. 2001)). The prosecutor's comments and argument on this point were not error, much less fundamental error.

### E.  Defendant Shot Mr. Billings "Like a Dog"

Gonzalez claims that the prosecutor engaged in an improper pejorative characterization of him during closing argument. Gonzalez posed no objection to this comment and must show fundamental error to obtain relief—that is, the improper comment "must be so prejudicial as to taint the jury's recommended sentence." Thomas, 748 So. 2d at 985 n.10. The comment challenged by Gonzalez involved a characterization of the manner in which Gonzalez shot Byrd Billings in front of Melanie Billings. The prosecutor argued, "He let her stand there and watch him shoot her husband down like a dog."

"It is clearly improper for the prosecutor to engage in vituperative or pejorative characterizations of a defendant or witness." Gore, 719 So. 2d at 1201. We have previously condemned prosecutors for repeatedly using the word execute; characterizing the defendant as violent, brutal, vicious, or ruthless; or using terms which tend to dehumanize a capital defendant. See Urbin, 714 So. 2d at 420 n.9;

- 50 -

Brooks, 762 So. 2d at 900.  However, in Brooks, we characterized a similar "shot like a dog" comment as part of a "slight emotional flow" that was "properly confined to inferences based on record evidence and was therefore proper."  762 So. 2d at 900.  The prosecutor in Brooks made comments that the victim "did nothing . . . to deserve being shot like a rabid dog on the driveway in front of his home" and "fell down to this cold cement, life flowed out of him," that "blood flowed onto that cold concrete," that "life flowed out of him," and that he "died there on that cold slab of cement."  Id. at 899 (emphasis added).  In this case, the prosecutor's comment was brief and much less emotionally evocative than the comments in Brooks.  The comment was also confined to inferences drawn from the evidence, as Mrs. Billings was in the bedroom when her husband was murdered.

It is also clear from the context[8] that the prosecutor intended this comment to be considered as evidence of Gonzalez's "utter indifference to . . . the suffering of others," which is necessary for the application of the HAC aggravating factor.  State v. Dixon, 283 So. 2d 1, 9 (Fla. 1973).  Shooting deaths can qualify for the

---

8. Before and after this disputed comment, the prosecutor used several key phrases relevant to the analysis of whether the HAC aggravator should apply: "That aggravating circumstance as it relates to heinous, atrocious and cruel perhaps is even worse in [Mrs. Billings'] case," "she was in mortal fear for her own life," "[Gonzalez] wanted to inflict a high degree of pain with utter indifference to the suffering of others," and "Melanie Billings was terrorized in her home for several minutes before she was killed."

HAC aggravator when the victim endures fear, emotional strain or terror, <u>James</u>, 695 So. 2d at 1235, and is conscious and aware of impending death, <u>Douglas v. State</u>, 878 So. 2d 1246, 1261 (Fla. 2004). The victim's mental state may be evaluated in accordance with common-sense inferences from the circumstances, <u>Swafford v. State</u>, 533 So. 2d 270, 277 (Fla. 1988), and the victim's perception of imminent death need only last seconds for this aggravator to apply, <u>Buzia v. State</u>, 926 So. 2d 1203, 1214 (Fla. 2006). It is a common-sense inference that watching her husband get shot execution-style after refusing Gonzalez's demands would cause Mrs. Billings great emotional strain and fear of her own impending death. Thus the "shot him like a dog" comment, while ill-advised, was relevant to HAC and was proper. Even if improper, the comment was harmless error. <u>See</u> <u>Bonifay</u>, 680 So. 2d at 418 (concluding that prosecutor's use of the word "exterminate" once during closing argument was not harmful error).

## F. Denigration of the Role of the Jury

Gonzalez claims that the prosecutor improperly denigrated the role of the jury by telling the jury that its role was advisory and that it would make a sentencing recommendation to the judge. We find that the prosecutor's argument fully and accurately advised the jury of its role and therefore was not improper.

## VIII. Errors in the Penalty Phase Jury Instructions

Gonzalez raises challenges to three of the penalty phase jury instructions given, arguing that the instructions denigrated the role of the jury, informed the jury that its verdict need not be unanimous as to the aggravating factors supporting a death sentence, and excluded mercy from jury consideration. We address Gonzalez's first two claims, relating to denigrating the role of the jury and the jury's nonunanimous sentencing decision, as part of his constitutionality claim below. As to his claim that the trial court improperly excluded the concept of mercy when it instructed the jurors that they were not to feel sorry for anyone or be influenced by sympathy, Gonzalez must demonstrate fundamental error because he did not object below. See State v. Weaver, 957 So. 2d 586, 588 (Fla. 2007) ("Jury instructions are subject to the contemporaneous objection rule, and absent an objection at trial, can be raised on appeal only if fundamental error occurred." (internal quotation marks omitted)). The trial judge instructed the jury as follows:

> There is no reason for failing to follow the law in this case. All of us are depending on you to make a wise and legal decision in this matter. Your recommendation must be decided only upon the evidence that you have heard from the testimony of the witnesses and these instructions. <u>Your recommendation must not be based upon the fact you feel sorry for anyone or are angry at anyone</u>. Remember, the lawyers are not on trial. Your feelings about them should not influence your decision.
>     It is entirely proper for a lawyer to talk to a witness about what testimony the witness will give if called to the courtroom. The witness should not be discredited by talking to a lawyer about his or her testimony. <u>Your recommendation should not be influenced by feelings of prejudice, bias or sympathy</u>. Your recommendation must

- 53 -

be based on the evidence and on the law contained in these instructions.

We have rejected similar claims regarding jury instructions on the role of sympathy. Zack, 753 So. 2d at 23-24; Hunter v. State, 660 So. 2d 244, 253 (Fla. 1995); see also Saffle v. Parks, 494 U.S. 484, 492-94 (1990). As such, the jury instructions given were not improper.

## IX. Errors in the Trial Court's Sentencing Order

In its order, the trial court found the following aggravators: (1) prior violent felony based on convictions for the contemporaneous murders of the Billings (great weight) and the 1992 robbery (some weight); (2) committed during the course of a robbery (great weight); (3) committed for financial gain (merged); and (4) HAC. Sentencing order at 4-5. The court considered all of the statutory mitigating factors, but found none to be proven. Id. at 6. The judge found the following nonstatutory mitigators: Gonzalez was a businessman who served the community and performed voluntary community service work (some weight); Gonzalez is a devoted husband, a devoted father to his children, and a father to all children, as evidenced by his community service (little weight[9]); and Gonzalez came from a broken home, suffered from depression and attention deficit disorder,

---

9. The judge gave this factor little weight in light of its overlap with the prior factor.

and was addicted to pain medication (little weight[10]).  Id. at 7.  The judge rejected the nonstatutory mitigator that the other codefendants faced life sentences or less, finding that Gonzalez had a predominant role in the crimes.  Id.  "Three sufficient aggravating circumstances exist[ed] which far outweigh[ed] the three insignificant and insufficient mitigating circumstances," making death the appropriate sentence. Id. at 8.

Gonzalez contends that the trial court's sentencing order includes a number of errors that require a new sentencing proceeding.  His claims include errors in assigning weight to the aggravating circumstances of (1) HAC and (2) prior violent felony conviction; (3) improperly considering the contemporaneous murder of the other spouse as a prior violent felony, which acted as an automatic aggravator; (4) failing to require a special jury verdict form to inform the court of the theory of murder upon which the jury found Gonzalez guilty; (5) finding the HAC aggravator despite insufficient evidence to support its application; (6) failing to find and weigh the statutory mitigating circumstances of no significant criminal history and age; and (7) considering and weighing the nonstatutory mitigating evidence.  Each claim will be considered in turn below.

## A.  Assignment of Weight to the HAC Aggravating Circumstance

---

10. The judge found evidence of a normal upbringing and no deprivation.

The general rules applicable to sentencing orders were set forth in Campbell v. State, 571 So. 2d 415, 420 (Fla. 1990), and refined through later cases. The procedural requirements that a trial judge must follow in a sentencing order for a capital case include (1) expressly evaluating, in his or her written order, each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature; (2) assigning a weight to each aggravator and mitigator properly established; (3) weighing the established aggravating factors against the established mitigating factors; and (4) providing a detailed explanation of the result of the weighing process. Fennie v. State, 855 So. 2d 597, 608 (Fla. 2003).

Gonzalez claims that the trial judge erred in failing to assign weight to the HAC aggravating circumstance. The trial court assigned weight to each of the aggravating and mitigating factors it found proven, except for the HAC aggravator. Accordingly, the sentencing order does not comply with the requirements of Campbell. Id. at 608 (reiterating that "Campbell, as subsequently interpreted by this Court, requires a trial judge to assign a weight to each aggravating factor and also to each mitigating factor that he or she deems has been established"). While this does constitute error, failure to strictly comply with this requirement does not necessarily entitle Gonzalez to relief. See Griffin v. State, 820 So. 2d 906, 914 & n.10 (Fla. 2002).

In Griffin, we applied a harmless error analysis to review a trial court's sentencing order. The order did not mention the word "rehabilitation," which led the defendant to claim that "the trial court failed to consider the evidence of his potential for rehabilitation" as mitigation. Id. at 913-14. We concluded, however, that a full reading of the order revealed the trial court's "thorough weighing and consideration of the factors upon which [the defendant's] potential for rehabilitation was specifically grounded." Id. at 914. We reiterated the importance of the Campbell requirements, but also stated that we would not remand "where the trial court's order is only minimally defective." Id. at 914 n.10; cf. Woodel v. State, 804 So. 2d 316, 327 (Fla. 2001) (vacating defendant's death sentences because the multiple deficiencies in the trial court's sentencing order, such as failing to expressly evaluate each mitigator, determine whether the mitigators were truly mitigating, assign weights to the aggravators and mitigators, undertake the required weighing process, and provide a detailed explanation of the result of that weighing process, precluded us from conducting a "meaningful review of the imposition of the death sentence or undertak[ing] our proportionality review"). Therefore, we found the court's omission of the word "rehabilitation" to be "at worst harmless error." Griffin, 820 So. 2d at 914.

Similarly, the sentencing order in this case is only minimally defective. The one deficiency in the order is the judge's failure to assign weight to HAC. The

order is detailed, addresses the matters claimed in mitigation and aggravation, assigns weight to those proven, and weighs the aggravators against the mitigators. The failure to assign weight to HAC does not preclude this Court from conducting a meaningful review of the appropriateness of a death sentence or performing a proportionality review. The sentencing order discusses this aggravating factor in more detail than the other aggravators, noting the victims' logical fear for their safety and that of their children, outlining the sequence of the attacks on the victims, and describing the crimes as a "combination of ghastly acts." Sentencing order at 5. To conclude the weighing analysis, the order describes the three aggravating factors as "sufficient" and "far outweigh[ing]" the mitigating factors. Id. at 8. As we have observed, HAC is considered one of the weightiest aggravators in the statutory scheme. See Hall v. State, 107 So. 3d 262, 278 (Fla. 2012), cert. denied, 134 S. Ct. 203 (2013); Jackson v. State, 18 So. 3d 1016, 1035 (Fla. 2009); Aguirre-Jarquin v. State, 9 So. 3d 593, 610 (Fla. 2009). Here, the failure to assign a specific weight to HAC is harmless error.

**B. Assignment of Weight to the Prior Violent Felony Aggravator**

In considering the prior violent felony aggravating factor, the sentencing judge refers to the contemporaneous murder convictions in the instant case (great weight) and the 1992 robbery conviction (some weight). Sentencing order at 4. Gonzalez claims that the judge erred in assigning a separate weight to these two

prior violent felonies within the prior violent felony aggravator.  Gonzalez does not allege that the court considered this aggravator twice[11]—only that the court erred in assigning two different weights to this factor based on the different convictions.

Although the judge refers to two different convictions, it is clear that he only considered them as one aggravating factor, since both convictions are discussed as item number one under the heading "Findings of Aggravating Circumstances." Sentencing order at 4.  Also, the weighing analysis only mentioned three aggravators, id. at 8, meaning that the prior violent felony aggravator was counted only once, along with the two other aggravators—HAC and that the murders were committed during the course of a robbery.  As we explained in Bright, "[i]f a defendant has multiple convictions for prior violent felonies, the trial court can find only a single aggravating circumstance, but it may give that circumstance greater weight based upon the existence of multiple convictions."  90 So. 3d at 261 (emphasis added).  That is exactly what the trial court did in this case.  There was no error.

### C.  Contemporaneous Murder as an Automatic Aggravator

Gonzalez argues that the trial judge's consideration of the contemporaneous murder of one spouse as a basis for the prior violent felony aggravator in the

---

11. See Bright, 90 So. 3d at 260-61 (finding error where trial court found prior violent felony aggravator twice based on 1990 robbery conviction and contemporaneous murder of other victim and accorded it great weight twice).

murder of the other spouse was improper because it creates an automatic aggravator when a defendant kills more than one victim during the same episode. However, this Court has previously rejected this claim. See Mosley, 46 So. 3d at 526 (rejecting claim that a double murder automatically establishes the prior violent felony aggravator and noting that this Court has "consistently and repeatedly held that a contemporaneous conviction of a violent felony can be a basis for the prior violent felony aggravator"). As such, the trial judge in the instant case properly considered the contemporaneous murders of the Billings in his analysis of the prior violent felony aggravator.

### D. No Special Verdict Form

Gonzalez argues that the trial court erred in not requiring the jury to specify on a special verdict form whether it found him guilty of premeditated first-degree murder, first-degree felony murder, or both. However, we have held that "Florida law does not require the use of special verdict forms." Turner v. Dugger, 614 So. 2d 1075, 1081 (Fla. 1992); see also Parker v. State, 641 So. 2d 369, 375 (Fla. 1994) ("[S]pecial verdicts identifying the type of murder are not required."). There is no merit to this claim.

### E. HAC Aggravator

Gonzalez asserts that there is insufficient evidence to support the HAC aggravator for both murders. In applying this aggravator, the trial judge found:

As recounted earlier, there were two capital felonies committed upon the Billings in consecutive, execution fashion. It is logical to assume they were both terrified for the safety of themselves and their minor children when this ordeal began. As events escalated it would have become apparent to them that their lives were in great jeopardy and that they would not survive this attack. They may have also rightfully assumed that their minor children would not be left behind as witnesses to these events.

Byrd Billings was shot first, once in each leg. Testimony of the medical examiner revealed these wounds would be painful but not fatal. Still alive and conscious, Byrd Billings was moved to his bedroom and shot in the side of his face. This wound was more serious but may have not been a mortal wound. He was shot twice more in the cranium and these wounds were certainly fatal. Melanie Billings witnessed this atrocity and surely knew she would be defendant's next victim.

Melanie Billings was then confronted by defendant and then shot at close range first in the head and then in the chest after she lay supine on the floor of her bedroom. Her death from these wounds was more instantaneous than that of her husband.

This combination of ghastly acts establishes that the capital felonies were especially heinous, atrocious or cruel. Frances v. State, 970 So. 2d 806, 815 (Fla. 2007). See also Wade v. State, 41 So. 3d 857 (Fla. 2010); Farina v. State, 801 So. 2d 44 (Fla. 2001).

Sentencing order at 5.

In reviewing an aggravating factor challenged on appeal, "it is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt." Aguirre-Jarquin, 9 So. 3d at 608 (quoting Willacy v. State, 696 So. 2d 693, 695 (Fla. 1997)). Such is the task of the trial court. This Court's job is "to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its

finding." Id. The trial court did not define HAC[12] in its sentencing order, but it

did cite our decision in Frances, which explains the aggravator as follows:

> HAC focuses on the means and manner in which the death is inflicted
> and the immediate circumstances surrounding the death, rather than
> the intent and motivation of a defendant, where a victim experiences
> the torturous anxiety and fear of impending death. Thus, if a victim is
> killed in a torturous manner, a defendant need not have the intent or
> desire to inflict torture, because the very torturous manner of the
> victim's death is evidence of a defendant's indifference.

Frances, 970 So. 2d at 815 (quoting Barnhill v. State, 834 So. 2d 836, 849-50 (Fla.

2002)).

"Generally, shooting deaths do not qualify as HAC because they are

instantaneous, or nearly so . . . unless the shooting is accompanied by additional

acts resulting in mental or physical torture to the victim." Allred v. State, 55 So.

3d 1267, 1280 (Fla. 2010). However, the HAC aggravating circumstance will

apply in cases where the victim is terrorized before being shot or endures fear and

---

12. We have previously stated:

> It is our interpretation that heinous means extremely wicked or
> shockingly evil; that atrocious means outrageously wicked and vile;
> and, that cruel means designed to inflict a high degree of pain with
> utter indifference to, or even enjoyment of, the suffering of others.
> What is intended to be included are those capital crimes where the
> actual commission of the capital felony was accompanied by such
> additional acts as to set the crime apart from the norm of capital
> felonies—the conscienceless or pitiless crime which is unnecessarily
> torturous to the victim.

Dixon, 283 So. 2d at 9.

emotional strain or the infliction of mental anguish.  <u>Lynch</u>, 841 So. 2d at 369.

The focus should be on "the victim's perceptions of the circumstances as opposed

to those of the perpetrator."  <u>Id.</u>  Further, the victim's mental state may be

evaluated in accordance with common sense inferences from the circumstances.

<u>Swafford</u>, 533 So. 2d at 277.  To support HAC, the evidence must show that the

victim was conscious and aware of impending death.  <u>Douglas</u>, 878 So. 2d at 1261.

However, the victim's perception of imminent death need only last seconds for this

aggravator to apply.  <u>Buzia</u>, 926 So. 2d at 1214.  Moreover, the actual length of the

victim's consciousness is not the only factor relevant to this aggravator.  <u>Beasley v.

State</u>, 774 So. 2d 649, 669 (Fla. 2000).  "[F]ear, emotional strain, and terror of the

victim during the events leading up to the murder may make an otherwise quick

death especially heinous, atrocious, or cruel."  <u>James</u>, 695 So. 2d at 1235.  "[A]

victim's suffering and awareness of his or her impending death certainly supports

the finding of the heinous, atrocious, or cruel aggravating circumstance where

there is a merciless attack . . . ."  <u>Cox</u>, 819 So. 2d at 720.

        In the instant case, both victims were terrorized before being shot.  Gonzalez

fired a warning shot into the floor to back up his threat that he would shoot the

Billings if they did not give up their money.  In the case of Mr. Billings, Gonzalez

shot him in one leg, repeated the request for money, and then shot him in the other

leg when Mr. Billings was still not forthcoming about the money.  Gonzalez then

placed Mr. Billings in a headlock and dragged him into the master bedroom where he shot him in the side of the face. Only after Mr. Billings was terrorized and endured repeated non-fatal shootings did Gonzalez finally shoot him in the head. As to Mrs. Billings, although her actual shooting and death occurred fairly quickly, she was aware of her impending death and probably fearful of suffering multiple gunshot wounds, having witnessed her husband being shot and suffer. She was then shot in the face, while looking at her attacker and knowing that her children were probably also in grave danger. We find that there is competent, substantial evidence to support the trial court's finding of the HAC aggravator.

### F. Statutory Mitigating Circumstances

### 1. No Significant Criminal History

Gonzalez argues that the trial court erred in not finding the statutory mitigating circumstance of "no significant history of prior criminal activity." During the penalty phase, Gonzalez specifically withdrew his request to instruct the jury on this mitigating factor when the State asserted that it would introduce evidence of a number of other convictions to disprove the mitigator. Moreover, Gonzalez did not argue this mitigating circumstance in his sentencing memorandum. The sentencing order stated that this mitigating factor "could not be satisfactorily proven." Sentencing order at 6.

As we have previously stated, the prior violent felony aggravator and the no significant history of prior criminal activity mitigator are mutually exclusive. Wasko v. State, 505 So. 2d 1314, 1317 (Fla. 1987). In the instant case, the trial judge found the prior violent felony aggravator, thereby precluding a finding of no significant criminal history. Contemporaneous crimes cannot provide a basis for rejecting the no significant criminal history mitigator. Bello v. State, 547 So. 2d 914, 917-18 (Fla. 1989) (finding that the trial court erred in rejecting this mitigator where the only prior violent felony conviction was for a contemporaneous crime). However, in the instant case, Gonzalez's criminal history consisted of not only the contemporaneous convictions for the murders of the Billings, but also his 1992 robbery conviction. Accordingly, "[i]t would [have been] illogical to find no significant prior history when there [was] a prior conviction of another . . . felony involving the use, or threat, of violence to a person. Such a conviction, by the nature of the crime, [is] significant." Wasko, 505 So. 2d at 1317. The trial judge properly rejected this statutory mitigator.

It is also relevant that Gonzalez withdrew his request to instruct on this mitigating factor, that the State would have presented evidence of Gonzalez's criminal history to rebut it, and that Gonzalez did not argue it in his sentencing memorandum. See, e.g., Blackwood v. State, 777 So. 2d 399, 410 (Fla. 2000) (finding that the evidence may support a statutory mitigator, but noting, however,

that defense counsel did not request a jury instruction on that mitigating factor, did not argue it to the jury, and did not urge the judge to consider it).  The trial court did not err in rejecting the no significant prior criminal history mitigator.

## 2.  Age

Gonzalez also argues that the trial court erred in rejecting the statutory mitigator of age.  It is relevant that in his sentencing memorandum, Gonzalez did not argue that this statutory mitigating factor was applicable.  Id. (stating that the evidence may support the statutory age mitigator, but noting, however, that "defense counsel did not request a jury instruction on age as a mitigating factor, did not argue to the jury that age was a mitigating factor, and did not urge the judge to consider the appellant's age as a statutory mitigating factor").  Also, contrary to Gonzalez's claim, the sentencing order does not state that the mitigator was rejected because Gonzalez was thirty-five years old.  Instead, the order recounts why Gonzalez's age was not a mitigating factor—because Gonzalez "was clearly the ringleader and the person who directed the other participants."  Sentencing order at 6.

"In Florida, numerical age alone may not be mitigating if not linked to some other material characteristic (e.g., immaturity)."  Lebron v. State, 982 So. 2d 649, 660 (Fla. 2008).  "Where a defendant is not a minor, no per se rule exists which pinpoints a particular age as an automatic factor in mitigation."  Kearse v. State,

770 So. 2d 1119, 1133 (Fla. 2000). Instead, the trial judge must evaluate this mitigator based on the evidence adduced at trial and at the sentencing hearing. Id. In the instant case, the evidence showed that Gonzalez functioned as an adult, including working various jobs, conducting self-defense workshops, and caring for his wife and children. There was no evidence of factors linking his age to any immaturity. Therefore, there was no error in the trial court's rejection of Gonzalez's age as a mitigating factor. Gonzalez cannot prevail on this claim regarding statutory mitigation.

### G. Nonstatutory Mitigating Circumstances

Gonzalez claims that the trial judge failed to assess all of the nonstatutory mitigators that Gonzalez offered and failed to give them proper weight. This subclaim has three separate parts: (1) the trial judge should have considered the disparate treatment of his codefendants as a mitigating factor; (2) the judge did not consider, as mitigating circumstances, Gonzalez's life sentence for the robbery conviction, appropriate courtroom behavior, National Guard service, suicide attempt, and alcohol use; and (3) the judge improperly grouped a series of unrelated mitigating circumstances into a single factor and assigned it little weight.

In his sentencing memorandum, Gonzalez argued four mitigating factors: (1) the disparate sentences of his codefendants; (2) that he was a businessman who taught martial arts, provided community service by teaching self-defense to

children and women, was recognized for his community service with an award, and earned gold medals as a child in the Junior Olympics in the sport of Taekwondo; (3) that he is a devoted husband, a devoted father to his children, and a father to all children, as evidenced by his community service; and (4) that he came from a broken home and was addicted to prescription drugs, which resulted in impairment at the time of the crimes. In its sentencing order, the trial court considered the same four categories of mitigation that Gonzalez had offered. The court rejected disparate sentencing of Gonzalez's codefendants as a mitigator and found the other three categories proven, giving them little to some weight. Sentencing order at 7.

## 1. Disparate Treatment of Gonzalez's Codefendants

Gonzalez's codefendants received the following sentences for the murders: Coldiron and Stallworth each received two consecutive life sentences for first-degree murder; Thornton and Florence both entered guilty pleas to two counts of second-degree murder and were sentenced to concurrent forty- and forty-five-year split sentences, respectively; and Gonzalez, Sr., and Sumner, the two men who did not enter the Billings' home, pled guilty to two counts of second-degree murder, for which Gonzalez, Sr., received concurrent seventeen and one-half-year

sentences, and Sumner received concurrent twenty-year sentences.[13]

"When a codefendant is equally as culpable [as] or more culpable than the defendant, the disparate treatment of the codefendant may render the defendant's punishment disproportionate." Sexton v. State, 775 So. 2d 923, 935 (Fla. 2000). However, if "the circumstances indicate that the defendant is more culpable than a codefendant, disparate treatment is not impermissible despite the fact the codefendant received a lighter sentence for his participation in the same crime." Brown v. State, 721 So. 2d 274, 282 (Fla. 1998); see also Hernandez v. State, 4 So. 3d 642, 671 (Fla. 2009) (finding disparate sentence of codefendant appropriate where defendant actually inflicted the fatal injuries to the victim). "A trial court's determination concerning the relative culpability of the co-perpetrators in a first-degree murder case is a finding of fact and will be sustained on review if supported by competent substantial evidence." Puccio v. State, 701 So. 2d 858, 860 (Fla. 1997).

In the instant case, the trial court noted that Gonzalez's sentence of death was not disproportionate to that of his codefendants as Gonzalez had a predominant role in the capital felonies. Sentencing order at 7. This determination is supported by competent, substantial evidence as the record shows that Gonzalez

13. Long-Wiggins was convicted of two counts of accessory after the fact and received concurrent sentences of twenty-eight and twelve years.

chose the Billings as the target for these crimes; approached the other participants with the plan to invade the Billings' home and take the safe that, according to Gonzalez, contained $13 million; obtained the clothing and disguises that the participants wore; supplied weapons to the participants; was in charge of the action once inside the house; was the only participant who fired his weapon in the Billings' home; and was the person who killed the Billings. The trial court committed no error in rejecting the disparate sentences of the codefendants as a mitigating circumstance.

## 2. Other Nonstatutory Mitigating Factors

Gonzalez also claims that the trial judge erred in failing to consider a number of nonstatutory mitigators, including his appropriate courtroom behavior, his life sentence for the home invasion robbery, his service in the National Guard, his suicide attempt, and his use of alcohol. However, as noted above, Gonzalez did not include any of these in the four mitigating circumstances he argued to the court at trial or in his sentencing memorandum.

In order to challenge on appeal the trial court's decision about a nonstatutory mitigating factor, the defendant must raise that proposed nonstatutory mitigating circumstance before the trial court. Lucas v. State, 568 So. 2d 18, 24 (Fla. 1990) ("[T]he defense must . . . identify for the court the specific nonstatutory mitigating circumstances it is attempting to establish."); e.g., Allred, 55 So. 3d at 1282-83

(finding no error for trial court not to consider family history of drinking problems and domestic violence where defendant included these in regard to his claim of impaired social and educational development but did not propose them as separate, nonstatutory mitigators); Davis v. State, 2 So. 3d 952, 962 (Fla. 2008) (concluding that trial court did not err in failing to consider evidence of Davis's impaired capacity during the murder as a nonstatutory mitigating factor because Davis did not argue that factor as a proposed nonstatutory mitigator to the trial court). Because Gonzalez did not raise as specific nonstatutory mitigators the factors that he cites here, the trial court committed no error in failing to consider them.

### 3. Bundling of Unrelated Nonstatutory Mitigators

Finally, Gonzalez claims that the trial court improperly bundled a number of factors into a single nonstatutory mitigating factor and then only assigned the factor little weight. To form the fourth mitigator, the trial court combined that Gonzalez came from a broken home, suffered from depression and an attention disorder, and was addicted to prescription pain medication. The court found this "combination of factors" to be proven as a mitigating circumstance, but only gave it "little weight in light of all the evidence presented during the penalty phase proceedings which showed that defendant did not have a deprived childhood but rather a normal upbringing." Sentencing order at 7.

The trial court did not err in its characterization of the fourth mitigator. In fact, this group of factors mirrors Gonzalez's grouping in his sentencing memorandum. In addition, this Court has explained that "proposed nonstatutory circumstances should generally be dealt with as categories of related conduct rather than as individual acts." Campbell, 571 So. 2d at 419 n.3. We have even noted broad categories of nonstatutory mitigating evidence which may be valid, including abused or deprived childhood; contribution to community or society as evidenced by an exemplary work, military, family, or other record; remorse and potential for rehabilitation; good prison record; disparate treatment of an equally culpable codefendant; and charitable or humanitarian deeds. Id. at 419 n.4.

In Kearse, the defendant raised a similar claim regarding the grouping of over thirty proposed mitigating factors into a category relating to the defendant's "difficult childhood and his psychological and emotional condition because of it." 770 So. 2d at 1133. We concluded that the trial court did not abuse its discretion in grouping the nonstatutory mitigating circumstances in this manner. Id. Similarly, in Reaves v. State, 639 So. 2d 1, 6 (Fla. 1994), we found no abuse of discretion in the trial judge's finding of only three nonstatutory mitigators. Although Reaves proffered nonstatutory factors in greater number, "the judge reasonably grouped several proffered mitigating factors into three." Id. Likewise, in the instant case,

the trial court's grouping or bundling of these proposed nonstatutory mitigating factors does not constitute error.

## X. Cumulative Effect of Penalty Phase Errors

Gonzalez contends that the cumulative effect of the errors in the penalty phase of his trial deprived him of due process and a reliable sentencing. The only errors were the prosecutor's creation of an "imaginary script" for Mrs. Billings and the trial judge's failure to assign weight to the HAC aggravator. Relief can only be granted if the errors cumulatively constitute fundamental error, meaning they "must be so prejudicial as to taint the jury's recommended sentence." Thomas, 748 So. 2d at 985 n.10. The cumulative effect of multiple harmless errors does not amount to fundamental error where the errors share three decisive factors: (1) none of the errors are fundamental; (2) none go to the heart of the State's case; and (3) the jury would still have heard substantial evidence in support of the defendant's guilt. See Braddy, 111 So. 3d at 860-61; Brooks v. State, 918 So. 2d 181, 202 (Fla. 2005), receded from on other grounds by State v. Sturdivant, 94 So. 3d 434 (Fla. 2012); Jackson v. State, 575 So. 2d 181, 189 (Fla. 1991).

Each of these three factors is present here. Neither of these two errors individually constitutes fundamental error. Nor do they go to the heart of the State's case. The imaginary script was brief and based on the facts of the case, and the failure to assign weight to the HAC aggravator was an oversight that did not

preclude this Court's review. Finally, even if these errors had not been committed, the jury still would have heard evidence that Gonzalez was suffering from financial difficulties, had met the victims and knew that they had money from their businesses, planned the crimes and picked the victims, solicited the other perpetrators to participate, obtained the clothing worn by the perpetrators, supplied guns to all of the participants, was seen on a Wal-Mart security video with two of the co-perpetrators shortly before the crimes, and owned the van, in which his fingerprints were found, which was identified in the surveillance video at the Billings' home. Thus the cumulative effect of the two harmless errors in this case does not amount to fundamental error. See Jackson, 575 So. 2d at 189 (finding that errors in admitting a portion of witness's prior testimony concerning threats made against him by defendant's family, arguing that jury should not have been allowed to draw inferences from the fact that defendant's mother did not testify, and giving jury a flight instruction that was unsupported by the evidence did not cumulatively amount to fundamental error).

## XI. Proportionality

Gonzalez claims that the death sentence is not proportionate in his case. "Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review." Hurst v. State, 819 So. 2d 689, 700 (Fla. 2002). In determining whether death is a proportionate penalty in a given

case, we must "determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders." Williams v. State, 37 So. 3d 187, 205 (Fla. 2010) (quoting Offord v. State, 959 So. 2d 187, 191 (Fla. 2007)). This analysis "is not a comparison between the number of aggravating and mitigating circumstances." Id. It "entails a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis." Id. (internal quotation marks omitted).

Here, the jury recommended that Gonzalez be sentenced to death by a vote of ten to two for each murder. The trial court properly found three aggravating factors—HAC, prior violent felony, and committed during the course of a robbery/pecuniary gain (merged)—and gave the last two aggravators great weight. The trial court found four categories of nonstatutory mitigating factors, which were assigned some, little or no weight. In addition, the record shows that Gonzalez was the individual who conceived these crimes, made the plans, accosted the Billings in their home, and fired all of the shots at the scene, including the fatal ones.

HAC and prior violent felony are among the weightiest aggravators in Florida's statutory scheme. Hodges v. State, 55 So. 3d 515, 542 (Fla. 2010). Additionally, this Court has upheld the death penalty as proportionate in cases with factual scenarios similar to the instant case. See, e.g., Hall v. State, 87 So. 3d 667, 672-73 (Fla.) (holding death penalty proportionate for murders of two people

- 75 -

during home invasion robbery where the court found four aggravators: prior violent felony, pecuniary gain, HAC, and created a great risk of death to many people; one statutory mitigator; and nine nonstatutory mitigators), cert. denied, 133 S. Ct. 537 (2012); McLean v. State, 29 So. 3d 1045, 1052 (Fla. 2010) (finding death sentence proportionate in home invasion robbery and murder where trial court found three aggravating factors: under sentence of imprisonment at the time of the murder, prior violent felony, and committed during the course of a robbery; two statutory mitigators; and six categories of nonstatutory mitigators); Green v. State, 907 So. 2d 489, 503-04 (Fla. 2005) (finding death penalty proportionate in murders of two people in their home for money, where trial court found the same three aggravators as in the instant case, two statutory mitigators, and six nonstatutory mitigators). Each of the cases cited above contained more mitigation than the instant case, yet we still found the death sentence to be proportionate. As such, we conclude that Gonzalez's death sentences imposed by the trial court are proportionate.

## XII. Constitutionality of Capital Punishment in Florida

Gonzalez raises a series of claims regarding the constitutionality of Florida's death penalty sentencing scheme. However, each claim is without merit. In numerous cases since Ring was released, we have rejected Ring claims similar to Gonzalez's claims. See Marshall v. Crosby, 911 So. 2d 1129, 1134 n.5 (Fla. 2005)

(listing over fifty cases in which this Court has rejected <u>Ring</u> claims). Further,

<u>Ring</u> does not apply to cases in which the prior violent felony aggravator applies.

<u>Hodges</u>, 55 So. 3d at 540.

Gonzalez cites the federal district court's decision in <u>Evans v. McNeil</u>, No.

08-14402-CIV, 2011 WL 9717450 (S.D. Fla. June 20, 2011), as support for his

claim that Florida's death penalty statute is unconstitutional in light of <u>Ring</u>.

However, the Eleventh Circuit Court of Appeals reversed the district court's ruling

on this point. <u>See</u> <u>Evans v. Sec'y, Fla. Dep't of Corr.</u>, 699 F.3d 1249, 1260-62

(11th Cir. 2012). The United States Supreme Court has also repeatedly "reviewed

and upheld Florida's capital sentencing statute over the past quarter of a century."

<u>Rigterink v. State</u>, 66 So. 3d 866, 895-96 (Fla. 2011) (quoting <u>Frances v. State</u>, 970

So. 2d 806, 822 (Fla. 2007).

Gonzalez's claims relating to the constitutionality of Florida's standard jury

instructions also lack merit as we have repeatedly rejected such challenges. <u>See,</u>

<u>e.g.</u>, <u>Coday v. State</u>, 946 So. 2d 988, 1006 (Fla. 2006) ("This Court has repeatedly

held that it is not unconstitutional for a jury to be allowed to recommend death on a

simple majority vote."); <u>Windom v. State</u>, 656 So. 2d 432, 438 (Fla. 1995) (finding

admission of victim impact evidence to be constitutional as long as it comports

with the United States Supreme Court's decision in <u>Payne v. Tennessee</u>, 501 U.S.

808 (1991)); <u>Ferrell v. State</u>, 653 So. 2d 367, 370 (Fla. 1995) (citing several cases

for the principle that there is no requirement in Florida that the jury be instructed on specific nonstatutory mitigators); <u>Sochor v. State</u>, 619 So. 2d 285, 291 (Fla. 1993) ("Florida's standard jury instructions fully advise the jury of the importance of its role and do not violate <u>Caldwell</u>.").

Finally, Gonzalez's claims regarding the constitutionality of the prior violent felony, murder in the course of a felony, and HAC aggravators are also meritless. We have repeatedly upheld the use of contemporaneous convictions for the prior violent felony aggravator and have rejected the characterization of such usage as creating an "automatic aggravator." <u>Mosley</u>, 46 So. 3d at 526. We have rejected the "automatic aggravator" claim as to the murder in the course of a felony aggravator as well. <u>Mills v. State</u>, 476 So. 2d 172, 178 (Fla. 1985); <u>see also</u> <u>Hudson v. State</u>, 708 So. 2d 256, 262 (Fla. 1998). Further, we have rejected claims that the prior violent felony and HAC aggravators are vague and overbroad. <u>Farina v. State</u>, 937 So. 2d 612, 618 & nn.5-6 (Fla. 2006); <u>Hudson</u>, 708 So. 2d at 260 n.4, 261; <u>James</u>, 695 So. 2d at 1235. Accordingly, this claim is without merit.

## XIII. Sufficiency of the Evidence

Although Gonzalez does not contest the sufficiency of the evidence, this Court has a mandatory obligation to independently determine whether there was sufficient evidence to convict Gonzalez of first-degree murder and armed home invasion robbery. <u>Kalisz v. State</u>, 124 So. 3d 185, 214 (Fla. 2013); Fla. R. App. P.

9.142(a)(5). Based on our review of the record, we find that there is competent, substantial evidence to support the verdict. We have outlined that evidence in great detail above.

## CONCLUSION

Based on the foregoing, we affirm Gonzalez's convictions and sentences for first-degree premeditated murder and home invasion robbery with a firearm.

It is so ordered.

POLSTON, C.J. and PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
CANADY, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Escambia County,
    Nicholas P. Geeker, Judge - Case No. 2009-CF-003249

J. Rafael Rodriguez, Specially Appointed Public Defender, Miami, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, and Carolyn M. Snurkowski, Associate Deputy Attorney General, Tallahassee, Florida,

    for Appellee